Max J. Epstein v. Commissioner. Philip M. Schlussel and Marilyn M. Schlussel v. Commissioner.
Epstein v. Commissioner
Docket Nos. 91579, 794-63.
United States Tax Court
T.C. Memo 1964-192; 1964 Tax Ct. Memo LEXIS 147; 23 T.C.M. (CCH) 1167; T.C.M. (RIA) 64192; July 14, 1964
*147 Held: Weekly payments made to petitioner Epstein by petitioner Philip M. Schlussel, pursuant to a formal agreement as consideration for Epstein's covemant not to compete, in fact represented part payments for the purchase of Epstein's going insurance brokerage business. Accordingly, such payments were capital gain to Epstein and unamortizable, nondeductible capital expenditures to Schlussel. Ray H. Schulz, 34 T.C. 235, affd. 294 F. 2d 52 (C.A. 9, 1961), followed. William Lamkay, for the petitioner in Docket No. 91579. Howard C. Amron, 733 3rd Ave., New York, N. Y., for the petitioners in Docket No. 794-63. Joseph M. Touhill, for the respondent. AKUNDELL Memorandum Findings of Fact and Opinion AKUNDELL, Judge: In these consolidated proceedings, respondent has determined deficiencies in income tax as follows: Docket
Defi-
No.
Year
Petitioner
ciency
91579
1959
Max J. Epstein
$ 530.23
794-63
1958
Philip M. Schlussel, et
ux.
1,151.36
794-63
1959
Philip M. Schlussel, et
ux.
1,141.72
The issue is whether certain weekly payments made to petitioner Epstein by petitioner Philip M. *148 Schlussel pursuant to a formal agreement as consideration for Epstein's covenant not to compete were, nevertheless, in fact, part payments for the purchase of Epstein's going insurance brokerage business. Findings of Fact Some of the facts were stipulated and are incorporated herein by reference. Petitioner Max J. Epstein (hereinafter called Epstein) is an individual residing at 61 Young Avenue, Croton on Hudson, N. Y. His Federal income tax return for the year 1959 was filed with the district director of internal revenue, New York, N. Y. During the taxable year 1959 Epstein kept his financial records and filed his tax return on the cash receipts and disbursements basis. Petitioners Philip M. Schlussel (hereinafter called Schlussel) and Marilyn Schlussel are individuals, husband and wife, residing at Barnwell Drive, White Plains, N. Y. Their joint Federal income tax returns for the years 1958 and 1959 were filed with the district director of internal revenue, New York, N. Y. During the taxable years 1958 and 1959 petitioners Schlussel and Marilyn Schlussel kept their financial records and filed their tax returns on the cash receipts and disbursements basis. In 1957 Epstein *149 had owned and operated for 46 years an insurance brokerage business under the name of Physicians' Insurance Agency. Epstein has been a duly licensed insurance broker in New York State since 1916. When Epstein started this business he had full possession of his eyesight. The business activity of Physicians' Insurance Agency for all times material herein consisted of the acquisition of insurance coverage for existing clients of that agency. Epstein retained a secretary in connection with his business operations. During the years shortly before 1957 Epstein also retained on a commission basis another insurance broker to help him with business activities in view of the fact that Epstein was losing his eyesight. During the same period of time in which Epstein was losing his eyesight and for a period after he had lost his eyesight, Epstein's wife, Elsie Epstein, who knew nothing of the operation of the business itself, helped Epstein principally by driving him around New York to visit clients. During 1957 Epstein and Schlussel negotiated for acquisition by Schlussel of the Physicians' Insurance Agency. At that time Epstein was 74 years of age and had become totally blind. He also had *150 a heart condition and wanted to get out of business on account of his health, age, and blindness. The original price asked by Epstein for the Physicians' Insurance Agency was $30,000. Epstein wanted payment of $6,000 at the time of the transfer of the assets and four additional annual payments of $6,000 each. The final total purchase price agreed upon by the parties was $27,000, payment of which was to be made, and was made, by a cash payment of $2,300 at the time of the transfer of the assets and $24,700 in weekly payments of $95 each for 5 years. The annual business income of Physicians' Insurance Agency in 1957 was in the amount of $10,000 or more and had been much higher in previous years. On October 15, 1957, two contracts, typed in the office of Howard C. Amron, attorney for the buyer, were signed relating to the sale of Physicians' Insurance Agency. One agreement between Epstein and Schlussel provided for the subsequent transfer of all of the assets of Physicians' Insurance Agency for a purchase price of $2,300. The second agreement between Epstein, Elsie Epstein, and Schlussel provided that the Epsteins would not enter into an insurance business for a period of 5 years *151 from October 15, 1957, and also provided that in return "for the covenants made hereunder" Schlussel shall pay to the Epsteins $24,700 at the rate of $95 a week for 5 years. Also, on October 15, 1957, a bill of sale was signed by Epstein and Elsie Epstein conveying to Schlussel the trade name and business of Physicians' Insurance Agency, together with the goodwill and all the records, forms, customers' lists and contracts owned by the agency. The contract of sale, the covenant not to compete, and the bill of sale do not reflect the real agreement of the parties. The real agreement between Epstein and Schlussel was that Epstein agreed to sell and did sell his insurance brokerage business to Schlussel for a consideration of $27,000 payable $2,300 in cash on October 15, 1957, and $95 a week thereafter for a period of 5 years. After the sale, Epstein came to Schlussel's office many times and assisted him in the conduct of the business. Epstein reported on his 1959 income tax return the amount of $4,940 received in connection with the aforesaid sale, as subject to capital gain treatment. The respondent determined that the entire $4,940 was taxable as ordinary income. Schlussel and *152 Marilyn Schlussel deducted on their 1958 and 1959 income tax returns the respective amounts of $4,940 and $5,035 as expenses incurred in connection with the covenant not to compete executed by Epstein and Elsie Epstein. The respondent disallowed the deductions. Ultimate Findings of Fact On October 15, 1957, Max J. Epstein sold the Physicians' Insurance Agency to Philip M. Schlussel for the total price of $27,000. The covenant not to compete of Max J. Epstein and Elsie Epstein, given in connection with such sale, was valueless surplusage and was prepared solely to provide petitioners Philip M. and Marilyn Schlussel with an income tax benefit. No consideration was given by Philip M. Schlussel for the covenant not to compete of Max J. Epstein and Elsie Epstein. The consideration of $27,000 given by Schlussel to Epstein was for the trade name and insurance brokerage business of Physicians' Insurance Agency, together with the goodwill and all the records, forms, customers' lists, and contracts owned by the Agency. Opinion The question in this case is the same kind of a question we had in , affd. (C.A. 9, 1961). *153 In that case a retiring partner in a four-partner partnership wanted to sell out his interest in the partnership for $111,000 which included $18,000 for goodwill. The other three partners made a counter offer of $107,000 but a compromise price of $109,000 was agreed upon. However, in the written agreement that was drawn up and signed, article II of the agreement provided for payment of $91,000 for the interest of the retiring partner and article IV of the agreement provided for payment of $18,000 for a covenant not to compete with the continuing partners for a period of one year. We held, nevertheless, "that the $18,000 ostensibly paid for Landen's [the retiring partner's] covenant was in fact paid as part of the consideration for Landen's partnership interest in Schulz Tool [the four-partner partnership]." In so holding, we recognized, as was stated in , affirming , that "when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an *154 assigned value, strong proof must be adduced by them in order to overcome that declaration. We think such proof has been adduced in the instant case to show that the covenant of the Epsteins was in fact of no value to Schlussel and that Epstein in fact sold his insurance brokerage business to Schlussel for a price of $27,000 and not for $2,300 as one of the agreements drawn up by Schlussel's attorney provided. Epstein's insurance brokerage business had been a profitable business earning from $10,000 a year and over. On October 15, 1957, when the written agreements were signed, Epstein was 74 years of age and totally blind. He also had a heart condition. His wife knew nothing about his insurance business and was not a business woman. Neither Epstein nor his wife had any idea of competing with Schlussel. Epstein wanted to get out of business on account of his health, age, and blindness. However, after the sale, he did assist Schlussel in the conduct of the business. It is well established that the Courts may look behind contracts such as are here involved and are not bound by the formalities *155 created. ; ; (C.A. 9, 1961), affirming ; (C.A. 9, 1962), affirming a Memorandum Opinion of this Court; (C.A. 7, 1963), affirming a Memorandum Opinion of this Court; . In the instant case we believe there is a necessity to look beyond the written formalities of sale, transfer, and covenant not to compete to discover the substantial agreement of the parties because the evidence of record conflicts with the documents themselves and fails to form any reasonable basis upon which such agreements could have been drawn. When an attempt is made to discover a sound commercial reason for Amron's drafting of the document containing the covenant not to compete, the contradictions found and the position taken by Schlussel become evident. We are asked to believe that Epstein at the age of 74, after having become totally blind and in poor health was in a position to maintain *156 a competitive position worth $24,700 to Schlussel. We are also asked to believe that Elsie Epstein, who by uncontradicted evidence knew nothing of the business, was also able to assume a competitive position, either alone or in conjunction with her husband, which was worth $24,700 to Schlussel. Finally, we are asked to believe that only $2,300 was paid by Schlussel for a business which on uncontradicted evidence was producing an annual income of $10,000 and more. We cannot accept such assumptions. The evidence of record shows that the sale of Physicians' Insurance Agency was for the total purchase price of $27,000 and that the covenant not to compete executed in connection therewith was merely surplusage, without economic or substantial legal effect, fabricated for the sole purpose of obtaining a favorable tax benefit for the buyer. We hold, therefore, that Epstein is entitled to capital gain treatment for all of the profits resulting from the sale of Physicians' Insurance Agency, and that Schlussel may not deduct the amounts paid to Epstein in connection with the sale. Decisions will be entered under Rule 50.